IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| A. RAHEEM-HASSAN IBN DAVIS, | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | Civil Action No. AW-08-2278 |
| | * | |
| CORRECTIONAL MEDICAL | * | |
| SERVICES, INC., *et al.*, | * | |
| Defendants | * | |

******
**Memorandum Opinion**

There are numerous motions pending before the Court: (1) motions for summary judgment by Defendant Dr. Rakesh Malik, Doc. No. 85, Defendant Correctional Medical Services, Inc. ("CMS"), Doc. No. 87, and Defendant Gary Maynard, Doc. No. 89, (2) Plaintiff's motion to reopen the deposition of Dr. Malik, Doc. No. 100, (3) Plaintiff's motion to compel CMS to respond to interrogatories and document-production requests, Doc. No. 110, (4) Plaintiff's motion to compel Maynard to respond to interrogatories, Doc. No. 113, (5) Plaintiff's motion to modify the scheduling order, Doc. No. 116, and (6) motions to seal various memoranda and exhibits, Doc. Nos. 86, 97, 102, 108, 112, 115. The Court has reviewed the record and finds that no hearing is necessary. *See* Loc. R. 105(6) (D. Md. 2010).

First of all, the Court has reviewed the unopposed motions to seal and finds that they are reasonable. Each request is limited to memoranda and exhibits that have been designated as confidential pursuant to the Parties' stipulated protective order, Doc. No. 68, which was accepted by the Court, Doc. No. 69. The sealed materials include medical records of Plaintiff and confidential aspects of Defendants' business and prison-administration records. Furthermore, the Court finds that there is no reasonable alternative to sealing the documents. Thus, the motions will be granted.

1

Instead of resolving the Parties' extensive discovery disputes, the Court will refer those matters to one of our magistrate judges. The Court acknowledges that this procedure necessitates some delay; such delay, in turn, may ultimately require modification of the scheduling order. Plaintiff's motion to extend the scheduling order by three months is, in large part, premised upon the merits of its three underlying discovery motions, *see* Doc. No. 116, which the Court declines to address at this juncture. However, in order to allow time for the magistrate judge to resolve the pending motions, the Court will provisionally grant Plaintiff's motion to modify the scheduling order. When the magistrate judge addresses the discovery motions, he/she may revisit that decision and determine an appropriate schedule going forward.

Nonetheless, the Court is prepared to decide the three pending summary-judgment motions without the benefit of rulings on the discovery motions. For the reasons stated below, even if Plaintiff were not granted any additional discovery opportunities, he has adduced sufficient evidence to place all material facts in dispute. Therefore, the Court will deny each of the motions for summary judgment.

## I. FACTUAL & PROCEDURAL BACKGROUND

The following summary consists of undisputed facts and Plaintiff's version of the disputed facts, except when otherwise noted. Around 5:00 p.m. on January 10, 2008, Plaintiff, then an inmate at the Maryland Correctional Training Center ("MCTC"), suddenly felt unbalanced while taking a shower and had to hold himself against a wall to avoid collapsing. Another inmate assisted him in leaving the shower, and a correctional officer sent him to the MCTC dispensary.

He arrived at the dispensary between 6:00 and 6:50 p.m., where he was examined by Dr. Ava Joubert. According to Dr. Joubert, Plaintiff presented with classic stroke symptoms: slurred speech and right-sided weakness. Thus, she diagnosed him as possibly suffering from a mini-stroke, or transient

ischemic attack ("TIA"). She began arranging to have him transferred to the Washington County Hospital ("WCH"), where it would be possible to have neural imaging work done to definitively determine whether he had suffered a stroke. However, she was a relatively new employee, so prior to referring inmates for external medical treatment, she had to follow protocol. She was not aware what the referral protocol was, so she contacted the regional medical director to find out. At that time, the regional medical director was Dr. Malik.

Sometime between 7:00 and 8:00 p.m., she and Dr. Malik spoke via telephone about Plaintiff's condition. She claims that she gave Dr. Malik the information she had acquired regarding Plaintiff's neurological symptoms and expressed her belief that he was having a TIA and needed to be evaluated at the hospital. (She also testifies that she communicated to Dr. Malik that she was concerned about Plaintiff's high blood pressure.) According to Dr. Joubert, Dr. Malik refused to refer Plaintiff to WCH. He indicated that the medical team's priority should be to get Plaintiff's blood pressure under control, and that this task could be handled by the Maryland Correctional Institute-Hagerstown ("MCI-H") infirmary. Unlike WCH, the MCI-H does not have does not have CT scan or MRI equipment.

Per Dr. Malik's instructions, Plaintiff was transferred to the MCI-H. At approximately 9:00 p.m., Dr. Joubert, concerned about Plaintiff's health, went to the MCI-H to check the results of an electrocardiogram ("EKG") she had ordered for Plaintiff. After reviewing the EKG, she concluded that his condition was abnormal, and she again telephoned Dr. Malik, shared her concerns, and urged that Plaintiff be transferred to the hospital. Dr. Malik again refused, urged her to go home, and told her that he would come in and evaluate Plaintiff himself.

Dr. Malik arrived at the MCI-H over two hours later, around 11:30 p.m. According to Plaintiff, Dr. Malik did not physically examine him, but rather stood at the entrance, looked at him, and stepped

3

back out of the room. Plaintiff claims to have overheard members of the medical staff telling Dr. Malik that they had called an ambulance to transport Plaintiff to the hospital, but that Dr. Malik ordered them to cancel the ambulance. Thus, Plaintiff remained at the MCI-H until the following afternoon, when, after reviewing additional evidence of Plaintiff's right-sided weakness, Dr. Malik agreed to send him to the WCH. Emergency personnel at WCH concluded that Plaintiff had indeed suffered a stroke.

The account of these events provided in Dr. Malik's deposition (and his contemporaneous medical notes) differs significantly with aspects of the above summary. He claims that during his initial conversation with Dr. Joubert (around 7:00 – 8:00 p.m.), she emphasized Plaintiff's blood pressure, headaches, and irregular heartbeat, but not his TIA symptoms. As for the alleged second phone call that Dr. Joubert made to Dr. Malik after reviewing Plaintiff's EKG, Dr. Malik maintains that he never received such a call. On the contrary, he says that he was called by a nurse around 10:00 or 10:30 p.m. to inform him that the EKG was available, but that no doctor was available to read it as Dr. Joubert had already left. He then left his home and drove to the MCI-H.

According to his deposition, it was only after evaluating Plaintiff and ordering medications, tests, and nursing interventions that he concluded that Plaintiff was not suffering from a condition requiring a referral. He believed that Plaintiff was suffering from hypertension, not a stroke. His contemporaneous notes suggest that he investigated Plaintiff's neurological condition and found that Plaintiff's face was not drooping (facial droop is another common stroke symptom) and that his slurred speech had existed for more than twenty-four hours (suggesting that it was not connected to a TIA). Furthermore, he asserts that mere hours later, in the early hours of the morning on January 11, he returned to the infirmary to re-examine Plaintiff. He determined at that time that Plaintiff's blood pressure was under control. He claims that it was only during a later visit to the infirmary in the afternoon that he was first informed, by

4

a report of the nursing staff, that Plaintiff was suffering from right-sided weakness. Based on that report, Dr. Malik again evaluated Plaintiff and referred him to WCH for a CT scan.

Nonetheless, Dr. Malik's deposition admits several facts that are important in assessing his awareness of Plaintiff's health risks. First, he was aware that right-sided weakness and slurred speech are TIA symptoms, and that TIA is a serious health risk (specifically, he acknowledges that people who have had TIAs are at higher risk of stroke). Second, he knew that neural imaging technology is important for definitively diagnosing a TIA, and that the MCI-H lacked such technology. Finally, he understood that there is often a short window of opportunity—usually three hours—for effectively treating TIAs.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and

draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III. ANALYSIS

All three motions for summary judgment rise or fall on the central issue of whether Dr. Malik is liable under 42 U.S.C. § 1983 for violating Plaintiff's Eighth Amendment rights by exhibiting "deliberate indifference to [his] serious medical needs."[1] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Supreme Court has equated deliberate indifference with "recklessness," noting that the applicable *mens rea* lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

In order to be liable, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Put differently, a deliberate-indifference claim requires a plaintiff to establish both an objective and a subjective element: "1) that objectively the deprivation of a basic human need was sufficiently serious, and (2) that subjectively the prison officials acted with a sufficiently culpable state of mind." *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quotation and internal quotation marks omitted). Due to the subjective component of the test, a defendant cannot be held liable merely because an overlooked risk is "obvious." *Farmer*, 511 U.S. at 841-42. However, the obviousness of the neglected danger can serve as "circumstantial evidence" such that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

---

[1] Defendants' motions also urge dismissal of Plaintiff's state-law claims. However, Defendants' challenge to the state-law claims relies upon winning their challenge to the federal claim: they argue that dismissal of the latter would deprive the rest of the action of its jurisdictional basis. Furthermore, Plaintiff maintains that even if his section 1983 claim against Dr. Malik is dismissed, he can still prevail against CMS and Maynard on other theories of vicarious liability. Because the Court holds that Plaintiff's section 1983 claim against Dr. Malik is fit to proceed to trial, it is unnecessary to address these issues.

Based on the available discovery record, a reasonable juror could find that Dr. Malik was deliberately indifferent to Plaintiff's serious medical needs in violation of section 1983. If the jury accepts Dr. Joubert's and Plaintiff's testimony over Dr. Malik's, the following factual narrative emerges:

1) Dr. Joubert had a strong foundation for diagnosing Plaintiff with a TIA based on his slurred speech and right-sided weakness,

2) She communicated the grounds for her diagnoses, as well as her conclusions, to Dr. Malik during their first conversation,

3) He rejected her recommendation to send Plaintiff to the WCH for neural imaging and instead insisted that Plaintiff be kept at the MCI-H infirmary, which lacked imaging technology,

4) After reviewing Plaintiff's EKG and concluding that it was abnormal, Dr. Joubert once again expressed her concerns to Dr. Malik in a second phone call several hours later, again to no avail,

5) Dr. Malik arrived at the MCI-H to evaluate Plaintiff four to five hours after receiving the original phone call from Dr. Joubert, even though he understood that the window of opportunity for treating a TIA is usually three hours,

6) Dr. Malik did not physically examine Plaintiff during his trip to the MCI-H, but merely stood at the door to Plaintiff's room, took a look at him, and left,

7) Outside of Plaintiff's room, the medical staff informed Dr. Malik that Plaintiff was suffering from right-sided weakness and that they had called an ambulance to take him to the hospital. He ordered them to cancel the ambulance,

8) Not until the following afternoon, when he was again informed by the medical staff of Plaintiff's right-sided weakness, did he send Plaintiff to the hospital, where emergency personnel confirmed that he had indeed suffered from a stroke.

From these facts, a reasonable juror could conclude that Dr. Malik was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," namely an untreated stroke. *Id.* at 837. Furthermore, based on the testimony of Plaintiff and Dr. Joubert that Dr. Malik had been told of Plaintiff's stroke symptoms and of the need to transfer him to the hospital multiple times, the jury could find that Dr. Malik in fact "dr[e]w the inference" that Plaintiff was faced with "a substantial risk of serious harm," yet failed to act out of deliberate indifference to Plaintiff's health. *Id.*

It is certainly true that there is another side to this story. Dr. Malik contends that he did not receive information about Plaintiff's stroke symptoms; that he carefully evaluated Plaintiff when he came to the MCI-H; and that, based on his own evaluation and what he was told at the time, he honestly and reasonable believed that Plaintiff was suffering from hypertension, not stroke. However, because Dr. Malik's account of the material facts directly contradicts the account given by other competent witnesses, it is for the jury, not the Court, to decide which story is most credible. *See, e.g.*, *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (per curiam) ("Although summary judgment under Rule 56 is a useful device for adjudicating prisoner § 1983 claims, it may not be invoked where, as here, the affidavits present conflicting versions of the facts which require credibility determinations."). Therefore, Defendants' motions for summary judgment will be denied.

## IV. CONCLUSION

A separate order will follow memorializing the decisions rendered in this opinion.

| July 15, 2011 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |

8